**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MASONITE CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 09 C 2131 |
| | ) |
| CRAFTMASTER MANUFACTURING, INC. | ) Honorable Joan B. Gottschall |
| | ) |
| Defendant. | ) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Masonite Corporation ("Masonite") maintains this patent infringement action against Craftmaster Manufacturing, Inc. ("Craftmaster") alleging that Craftmaster infringed three of its patents (U.S. Design Patent Nos. D516,225 (the "'225 patent"), D516,226 (the "'226 patent"), and D501,931 (the "'931 patent") by selling infringing door facing products under the Cashal® brand. Masonite has moved for partial summary judgment dismissing Craftmaster's seventh affirmative defense. Craftmaster has moved for partial summary judgment on the grounds that Masonite's '225 and '226 patents are invalid for nonenablement and indefiniteness under 35 U.S.C. § 112.

## I. BACKGROUND[1]

Masonite and Craftmaster entered into a license agreement ("License Agreement") on March 27, 2002 relating to door facings. Craftmaster is referred to in the License Agreement as "licensee." Among other things, the License Agreement provides:

---

[1] The parties are reminded that, per this court's standing order, no argument should be included in the Local Rule 56.1(a)(3) statement or the Local Rule 56.1(b)(3) statement. As noted in this court's standing order, "argument masquerading as fact will not be considered by the court." The parties are further reminded that, as noted in this court's standing order, "Facts must be set forth in **short** numbered paragraphs, generally limited to one fact per paragraph." (emphasis as in original.)

1.2   The term "LICENSED INTELLECTUAL PROPERTY" shall mean the intellectual property of Appendix 1, including the know-how, patents, and patent applications, as well as all continuations, extensions and divisions thereof, all patents which may be granted thereon, and all reissues and reexaminations thereof and all presently existing MASONITE inventions, ideas, discoveries, designs, techniques, skills, experience, technical data, apparatus, know-how, and trade secrets relating thereto, whether or not patentable or copyrightable.  The term LICENSED INTELLECTUAL PROPERTY RIGHTS shall not include any improvements or future developments controlled by, made by or for MASONITE, or as to which MASONITE may grant a license.

1.3   "LICENSED PRODUCT" shall mean any process or product, the manufacture, use, practice, importation, offer for sale or sale of which would, (i) if not licensed, infringe a VALID CLAIM of an issued patent in LICENSED INTELLECTUAL PROPERTY and/or (ii) incorporate or make use of any part of the LICENSED INTELLECTUAL PROPERTY.

1.6   "IMPROVEMENTS" shall mean any and all inventions, ideas, discoveries, designs, techniques, skills, experience, technical data, apparatus, know-how, and trade secrets, whether or not patentable, copyrightable, or otherwise protectable as intellectual property, hereafter developed or acquired by LICENSEE during the term of this Agreement.

2.1   MASONITE hereby grants to LICENSEE a non-exclusive, transferable as provided in Article 7.1, royalty-free, fully paid-up license within the FIELD and throughout the world to manufacture, practice, use, offer for sale, sell, have sold, import and otherwise dispose of LICENSED PRODUCT on the terms and conditions set forth below.

2.5   No license is granted by MASONITE, either directly or by implication, estoppel or otherwise, under any intellectual property, trademark, service mark, tradename, patent, patent application, know-how, or invention other than the LICENSED INTELLECTUAL PROPERTY.

2.6   All IMPROVEMENTS shall be the property of LICENSEE, and LICENSEE shall own all right, title, and interest in such IMPROVEMENTS, including, without limitation, the right to file intellectual property registrations and other protections in LICENSEE's name.

Appendix 1 of the License Agreement lists a "Hakuju" door as corresponding to U.S.

Patent Application No. 09/715,569, which was ultimately issued on November 12, 2002 as U.S.

Patent No. 6,479,128 (the "'128 patent").  The '931, '225, and '226 patents are not listed in

Appendix 1. Masonite has denied that the Hakuju door design and the '128 patent are material to the patentability of the claims of the '225 and '226 patents.

Masonite is the owner by assignment of the '931 patent, which was filed on October 29, 2002. Masonite is also the owner by assignment of the '225, and '226 patents, which list Mark Ruggie as an inventor and were filed on July 23, 2004. Both the '225 and '226 patents claim an ornamental design for a door facing, which appears to be the exterior of a door. Rather than have an entirely flat surface – as many doors do – these door facings each feature two rectangular panels (except that the top panel's upper edge is curved), one at the top of the door, one at the bottom of the door, that are set off from the rest of the door by a decorative trim that – like stair-steps – is incrementally recessed from and/or – the court cannot tell – incrementally protruding from the flat surface at the edges and middle of the door. In the drawings of the '225 and '226 patents, each level of protrusion or recession in the decorative trim surrounding the rectangular panels is represented by a contour line. The court cannot decipher whether the rectangular panels themselves are recessed from or protruding from the flat surface at the edges and middle of the door or whether they are flush with the edges and middle of the door, such that the surrounding decorative trim forms something akin to either a dam or a moat, but this distinction is of no consequence to the parties' dispute.

A.    The '225 patent

The '225 patent includes only two drawings, a Figure 1 and a Figure 2, each of which depict the door facing from a different vantage point. The contour of the decorative trim surrounding the upper rectangular panel as shown in Figure 1 is different from the contour of the decorative trim surrounding the corresponding upper rectangular panel as shown in Figure 2. In addition, the contour lines of the decorative trim surrounding the upper rectangular panel as

shown in Figure 2 are different from the contour lines of the decorative trim surrounding the

lower rectangular panel depicted in Figure 2.



Fig. 1

Fig. 2

B.    The '226 patent

The '226 patent includes, *inter alia*, Figures 1, 2, 6, and 7, each of which depict the door facing from a different vantage point.  The contour of the decorative trim surrounding the upper rectangular panel in Figure 1 is different from the contour of the decorative trim surrounding the corresponding upper rectangular panel in Figure 2.  In Figure 2, there is a horizontal line between the upper and lower rectangular panels of the door facing labeled "line 6-6."  Figures 6 and 7 purport to show a cross section of the door facing were it cut in half at line 6-6.[2]  The section of the door line 6-6 traverses is flat in Figure 2, while it is not flat in Figures 6 and 7.



Fig. 1

Fig. 2

Fig. 6

Fig. 7

---

[2]    Figure 7 provides an enlarged view of a portion of Figure 6.

C.    The Certificates of Correction

In August 2010, while the parties' cross-motions for partial summary judgment were pending, the United States Patent & Trademark Office ("PTO") issued certificates of correction for the '225 and '226 patents.  The United States Patent Act provides:

> Whenever a mistake of a clerical or typographical nature, or of minor character, which was not the fault of the Patent and Trademark Office, appears in a patent and a showing has been made that such mistake occurred in good faith, the Director may, upon payment of the required fee, issue a certificate of correction, if the correction does not involve such changes in the patent as would constitute new matter or would require re-examination. Such patent, together with the certificate, shall have the same effect and operation in law on the trial of actions for causes thereafter arising as if the same had been originally issued in such corrected form.

35 U.S.C. § 255.

## II.    LEGAL STANDARD

"'Summary judgment is as available in patent cases as in other areas of litigation.'" *Tokai Corp. v. Easton Enters., Inc.*, ---F.3d ----, Nos. 2010-1057, 2010-1116, 2011 WL 308370, *5 (Fed. Cir. Jan. 31, 2011) (quoting *Cont'l Can Co. USA, Inc. v. Monsanto Co*., 948 F.2d 1264, 1265 (Fed. Cir. 1991)).   "Summary judgment is appropriate when, drawing all justifiable inferences in the non-movant's favor, there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  *King Pharms., Inc. v. Eon Labs, Inc.*, 616 F.3d 1267, 1273 (Fed. Cir. 2010) (citations omitted).   In order to survive a Rule 56 motion, the nonmoving party must either:  (a) show that the movant cannot produce admissible evidence that a fact is not disputed, (b) show that the materials cited by the movant do not establish the absence or presence of a genuinely disputed material fact, or (c) direct the court's attention to specific admissible evidence in "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of

the motion only), admissions, interrogatory answers, or other materials" that show that there is some genuinely disputed material fact. Fed. R. Civ. P. 56(c)(1).

### III.  ANALYSIS

**A.  Whether the '225 and '226 Patents are Invalid as Indefinite and Nonenabling**

Patents are presumed to be valid. *Tokai Corp.*, 2011 WL 308370 at *6 (citing *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1365 (Fed. Cir. 2004)). To prevail on its motion for partial summary judgment, Craftmaster "must prove invalidity by clear and convincing evidence." *Id.* "The courts are the final arbiter of patent validity and, although courts may take cognizance of, and benefit from, the proceedings before the patent examiner, the question is ultimately for the courts to decide, without deference to the rulings of the patent examiner."[3] *Quad Envtl. Techs. Corp. v. Union Sanitary Dist.*, 946 F.2d 870, 876 (Fed. Cir. 1991); *See Nat'l Bus. Sys., Inc. v. AM Int'l, Inc.*, 743 F.2d 1227, 1230, 1232 (7th Cir. 1984) ("The decision of the Patent Office in the reissue proceeding is neither cloaked in a 'presumption of correctness' independent of the patent nor entitled to special deference in a separate federal court adjudication of patent validity." Also noting, "The purpose of the reissue proceeding is to correct inadvertent errors in the original patent which may make it 'wholly or partly inoperative or invalid.'"); *see also SSIH Equip., S.A. v. U.S. Int'l Trade Comm'n*, 718 F.3d 365, 375 (Fed. Cir. 1983) ("[T]he formulation of a legal conclusion on validity from the established facts is a matter reserved for the court. As a reviewing court, this court must determine not only that the facts on which a judgment of validity or invalidity was based were satisfactorily established, but also whether those facts form an adequate predicate for the legal conclusion ultimately made.").

---

[3]  The cases Masonite cites for the proposition that the court must defer to the United States Patent & Trademark Office are inapposite. *See Dickinson v. Zurko*, 527 U.S. 150, 152 (1999) (discussing the standard of review for agency factfinding), and *Lacavera v. Dudas*, 441 F.3d 1380, 1382-83 (Fed. Cir. 2006) (deciding a challenge to agency action). Here, the court is not reviewing whether the USPTO acted arbitrarily or capriciously in granting the patents or the certificates of correction.

Patent invalidity based on nonenablement and indefiniteness is a question of law. *Datamize,*

*LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005); *Sitrick v. Dreamworks,*

*LLC*, 516 F.3d 993, 999 (Fed. Cir. 2008). "At least in the context of design patents, the concepts

of nonenablement and indefiniteness serve a similar function and have been applied somewhat

interchangeably." *HR U.S. LLC v. Mizco Intern., Inc*., No. CV-07-2394 (DGT)(JO), 2009 WL

890550, *6 (E.D.N.Y. March 31, 2009) (citations omitted).

Section 112 of the United States Patent Act "requires the specification of a patent to

'conclude with one or more claims particularly pointing out and distinctly claiming the subject

matter which the applicant regards as his invention.'" *SmithKline Beecham Corp. v. Apotex*

*Corp*., 403 F.3d 1331, 1340 (Fed. Cir. 2005) (quoting 35 U.S.C. § 112, ¶ 2 (2000)). Indeed,

claims of a patent must be sufficiently definite to demarcate the scope of an invention so as to

adequately notify the public of the patentee's right to exclude. *Datamize, LLC*, 417 F.3d at 1347.

"To satisfy this requirement, the claim, read in light of the specification, must apprise those

skilled in the art of the scope of the claim." *SmithKline Beecham Corp.*, 403 F.3d at 1340; *See*

*Philco v. Admiral Corp.*, 199 F. Supp. 797, 801 (D. Del. 1961) ("A design patent must disclose

the configuration and complete appearance of the article in which the design is embodied so

fully, clearly and with such certainty as to enable those skilled in the art to make the article

without being forced to resort to conjecture." (citing *Ex parte Salsbury*, 38 U.S.P.Q. 149 (1938);

*Ex parte Sweeney*, 123 U.S.P.Q. 506 (1959); and *James E. Tompkins Co. v. New York Woven*

*Wire Mattress Co*., 159 F. 133 (2d Cir. 1907))). Claims are invalid as indefinite if they are "not

amenable to construction" or so "insolubly ambiguous" that "no narrowing construction can

properly be adopted." *Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d

1367, 1374 (Fed. Cir. 2008); *Aero Prods. Int'l, Inc. v. Intex Recreation Corp.*, 466 F.3d 1000,

1016 (Fed. Cir. 2006) (citing *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1353 (Fed. Cir. 2003)). "If a claim is amenable to construction, 'even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree,' the claim is not indefinite." *Aero Prods. Int'l, Inc.*, 466 F.3d at 1016 (quoting *Exxon Res. & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001)).

In addition, per 35 U.S.C. §§ 254-55, a "certificate of correction is only effective for causes of action arising after it was issued." *Novo Industries, L.P.*, 350 F.3d at 1356 (citing *Southwest Software, Inc. v. Harlequin Inc.*, 226 F.3d 1280, 1294 (Fed. Cir. 2000)). "For causes of action that arise before the correction becomes effective, the patent must be considered without the benefit of the certificate of correction." *Id.* Thus, since this lawsuit was filed before the certificates of correction were issued, the patents must be considered without them.

Craftmaster argues that it is entitled to partial summary judgment because it has clear and convincing evidence that the '225 and '226 patents are invalid as nonenabled and indefinite because the inconsistencies in the drawings of the claimed designs render the patents so unclear that a designer of ordinary skill in the art would not know precisely what appearance of the designs the patents protect. This court agrees. The '225 patent includes only two drawings – Figures 1 and 2. Craftmaster contends (and this court agrees) that the decorative trim surrounding the upper rectangular panel of the door facing as shown in Figure 1 of the '225 patents has five contour lines while Masonite contends that it has seven (Masonite explains that some of the lines bled together so that, in two instances, two lines appear as one).[4] Masonite does not appear to contest Craftmaster's conclusion (and this court's observation) that the decorative trim surrounding the corresponding upper rectangular panel shown in Figure 2 of the

---

[4]     The court concedes that at approximately the 2/3rd point on the top contour line, two lines appear to become three; still, even if the top line is viewed as being made up of three lines, the total number of contour lines is six, not seven.

'225 patent – which purports to show a different view of the same door facing depicted in Figure 1 – depicts only four contour lines. It is undisputed that the decorative trim surrounding the upper rectangular panel in Figure 1 is different from the corresponding decorative trim surrounding the upper rectangular panel in Figure 2, even though the figures purport to show different views of the same door facing. The inconsistencies in the two drawings cannot be reconciled. One skilled in the art would be forced to guess as to whether the decorative trim surrounding the upper rectangular panel of the door facing is supposed to contain four contour lines (as shown in Figure 2) or some other number shown in Figure 1, according to the parties, either five or seven (of course, the reader of the patent would not have the benefit of Masonite's knowledge that some of the lines bled together).

Similarly, Craftmaster contends (and this court agrees) that the decorative trim surrounding the lower rectangular panel shown in Figure 1 of the '225 patent shows five contour lines, while Masonite contends it contains seven (arguing that lines have bled together). Craftmaster asserts (and this court agrees) that the corresponding decorative trim surrounding the lower rectangular panel shown in Figure 2 of the '225 patent shows six contour lines, while Masonite believes that it has seven (again explaining that some lines have bled together and appear as one). One skilled in the art would be forced to again resort to conjecture – guessing as to whether the decorative trim surrounding the lower rectangular panel is supposed to contain six lines or five.[5]

---

[5]     Figures 1 and 2 of the '226 patent contain the same discrepancies as those of the '225 patent. However, the '226 patent contains a Figure 3 that shows the door panel from a direct, non-angled perspective. Figure 3 appears to have five contour lines in the decorative trim surrounding the upper rectangular panel and six contour lines in the decorative trim surrounding the lower rectangular panel. Thus, because most of the drawings in the '226 patent (Figures 1 and 3) depict the decorative trim surrounding the upper rectangular panel as having five contour lines, it is arguable that one skilled in the art can reasonably be expected to infer that the inconsistent drawing (Figure 2) contains an error when it comes to the upper rectangular panel. Similarly, because most of the drawings in the '226 patent (Figures 2 and 3) depict the decorative trim surrounding the lower rectangular panel as having six contour lines, it is arguable that one skilled in the art can reasonably be expected to infer that the inconsistent drawing

In addition, Masonite concedes that line 6-6 shown in Figure 2 of the '226 patent is misplaced and does not correspond – as it purports to do – to the sectional views shown in Figures 6 and 7 of the '226 patent. One skilled in the art would be forced to guess whether the cross-section at line 6-6 is supposed to be flat – as it appears in Figure 2 – or whether it is supposed to be partially concave and notched – as it appears in Figures 6 and 7.

Given the foregoing, there is no genuine issue of material fact as to whether the patent would apprise one skilled in the art of the scope of the claim. The drawings are plainly irreconcilably inconsistent and would fail to apprise one skilled in the art of the scope of the claim. No reasonable jury could conclude otherwise. Because Craftmaster has shown with clear and convincing evidence that one skilled in the art would not be able to ascertain the scope of the claim, Craftmaster is entitled to partial summary judgment that the '225 and '226 patents are invalid for nonenablement and indefiniteness.

Masonite's multiple arguments to the contrary are unavailing. For example, Masonite argues that, despite the foregoing, Craftmaster's invalidity challenge must fail because Craftmaster did not offer the declaration of an expert witness who could attest to how one skilled in the art would view the drawings. However, not only does Masonite *admit* that the figures are inconsistent and that what is supposed to be two lines sometimes appears as one given that some lines have bled together, but "a simple visual inspection of the [figures] both reveals the inconsistencies in the drawings and resolves the question of whether the inconsistencies render the patent[s] indefinite."[6] *HR U.S. LLC*, 2009 WL 890550 at *3; *See Advanced Tech. Incubator,*

---

(Figure 1) contains an error when it comes to the decorative trim surrounding the lower rectangular panel. Of course, if, as Masonite suggests, one skilled in the art would expect the decorative trim surrounding the top and bottom rectangular panels to be uniform, then one skilled in the art would be forced to guess how many contour lines are supposed to be included in the decorative trim.

[6] Masonite's reliance on *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341 (Fed. Cir. 2001), is misplaced. In *Biotec Biologische*, the court noted, "It is well established that conclusory

*Inc. v. Sharp Corp.*, No. 2:07-CV-468, 2009 WL 4670942, *7 (E.D. Tex. Sept. 18, 2009) ("The fact that a certificate of correction was sought in the first place demonstrates Plaintiff understood a mistake had been made."). Masonite cannot seriously argue that a reasonable jury could conclude that one skilled in the art would somehow know that what appears to be one line is actually two. Neither can Masonite plausibly argue that a reasonable jury could conclude that one skilled in the art, when faced with two irreconcilable options – would know which is correct. Accordingly, "[a]lthough expert testimony may be critical in some circumstances, such testimony is not needed in the instant case to either point out the inconsistencies in the drawings or to determine whether the inconsistencies render the patent indefinite." *HR U.S. LLC*, 2009 WL 890550 at *8.

Masonite also urges the court to excuse these discrepancies as minor, arguing that one skilled in the art would be able to figure out the correct appearance of the door facings. Masonite offers the declaration of Mark Ruggie, one of the inventors of the '225 and '226 patents, in support of this argument. First of all, "there are no portions of a design which are 'immaterial' or 'not important.'" *In re Blum*, 374 F.2d 904, 907 (C.C.P.A. 1967). "[D]esign is a unitary thing and all of its portions are material in that they contribute to the appearance which constitutes the design." *Id.*

Secondly, this is not a case in which there is one aberrant drawing amongst several consistent drawings, such that one skilled in the art could be expected to infer that the one aberrant drawing contained an error. Despite its admission that some of the contour lines in the

---

statements of counsel or a witness that a patent is invalid do not raise a genuine issue of fact." *Id.* at 1353. There, the defendants' primary witnesses "admitted knowing no facts that implied the invalidity of the patents." *Id.* at 1354. This case is easily distinguishable. Craftmaster has specifically pointed out both the inconsistencies in the drawings and Masonite's admissions about the same. Thus, Craftmaster's arguments are far from conclusory. For these reasons, *Austl. Vision Servs. Pty. Ltd. v. Diopitcs Med. Prods., Inc.*, 29 F. Supp. 2d 1152 (C.D. Cal. 1998), is also inapposite. *Id.* at 1159 (denying a motion for summary judgment for nonenablement where the movant did not present expert testimony in support of its arguments and instead supported its motion with conclusory statements.)

drawings bled together and appear as one, Masonite argues that it would be clear to one skilled in the art that, in two instances, what appears to be one line is actually two, and, given this, three of the four panels that appear in the figures have the same number of contour lines – seven. The argument continues that one skilled in the art would reason that, since three of the four panels were uniform, the fourth must be in error and must have been intended to contain seven lines like the others. This is unpersuasive. It defies reason to think that one skilled in the art would assume what appears as one line in the drawings to actually be two lines. Since this is not a case in which most of the drawings are consistent, such that an aberration was obviously in error, Masonite's reliance on cases to that effect is misplaced.[7] *See HR US LLC*, 2009 WL 890550 (since Figures 2, 3, and 4 were consistent with each other, one skilled in the art would assume that Figure 1's inconsistency was an error); *Antonious v. Spaulding & Evenflo Cos., Inc.*, No. 98-1478, 1999 WL 777450, *8 (Fed. Cir. Aug. 31, 1999) (since Figures 2 and 3 were consistent with each other, one skilled in the art would assume that Figure 4's inconsistency was an error.); *Park B. Smith, Inc. v. CHF Indus., Inc.*, No. 06 Civ. 869(LMM)(JCF), 2008 WL 650339, *5-7 (S.D.N.Y. Mar. 6, 2008) (a horizontal line that appeared in two of the ten drawings appeared to be extraneous and would not prevent an ordinary observer, much less a trained designer, from understanding the overall intended design), *vacated on other grounds*, 309 Fed. Appx. 411 (Fed. Cir. 2009).

---

[7]     Other cases to which Masonite cites are similarly inapposite. *See Ex parte Asano*, 201 U.S.P.Q. 315 (Pat. & Tr. Off. Bd. App. 1978) (errors and inconsistencies in drawings included in a patent for a toy vehicle – which has far more distinguishing features to set it apart from other toy vehicles than a commercial door facing – were minor and did not preclude the average designer of toy vehicles from knowing the scope of the invention or making the design); *Hadco Prods., Inc. v. Lighting Corp. of Am., Inc.*, 312 F. Supp. 1173, 1181 (D.C. Pa. 1970) (inconsistencies in drawings were inconsequential since a person skilled in the art of designing light fixtures would have no problem making and using the design), *vacated on other grounds sub nom. Hadco Prods., Inc. v. Walter Kidde & Co.*, 462 F.2d 1265 (3d Cir. 1972).

Third, "It is particularly inappropriate to consider inventor testimony obtained in the context of litigation in assessing validity under section 112, paragraph 2, in view of the absence of probative value of such testimony." *Solomon v. Kimberly-Clark Corp*., 216 F.3d 1372, 1379 (Fed. Cir. 2000); *Bell & Howell Doc. Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997) ("The testimony of an inventor is often a self-serving, after-the-fact attempt to state what should have been part of his or her patent application . . . ."). Indeed, "what the patentee subjectively intended his claims to mean is largely irrelevant to the claim's objective meaning and scope." *Solomon*, 216 F.3d at 1379 (citing *Markman v. Westview Instruments, Inc*., 52 F.3d 967, 985-86 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996)).

Masonite further argues that the inconsistent drawings should be forgiven because the drawings scale down an approximately six to eight foot commercial size door to the size of an 8½ x 11 inch page, causing some of the contour lines to bleed together and appear as one line instead of two. The court is unconvinced. As Craftmaster aptly points out, "If this excuse had any merit, it would virtually nullify the requirements of Section 112 to disclose claimed designs 'in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same.'" (Craftmaster's Reply in Supp. of its Mot. for Partial Summ. J. at 7.) "Every design patentee could then claim that he or she could not get the drawings right because the logistics of 'scaling down' a design to the proportions of an 8½ x 11 inch design patent drawing sheet make it difficult to do so." (*Id.*) Indeed, as Craftmaster argues (and as Masonite is undoubtedly aware), patentees faced with scaling down large designs can avoid enablement and indefiniteness problems by including additional drawings that show an enlarged view of intricate details (as Masonite did for the cross-section enlarged in Figure 7 of the '226 patent).

Lastly, Masonite argues in its surreply that this court must defer to what it characterizes as the USPTO's "implied factual finding" that the inconsistencies in the drawings in the '225 and '226 patents were "minor." To arrive at this conclusion, Masonite reasons that since (1) the USPTO may issue certificates of correction only for mistakes "of a clerical or typographical nature, or of minor character," 35 U.S.C. § 255, and (2) Section 1481 of the USPTO's Manual of Patent Examining Procedure states that "A mistake is not considered to be of the 'minor' character required for the issuance of a Certificate of Correction if the requested change would materially affect the scope or meaning of the patent," the USPTO must have found that the inconsistencies in the drawings here were minor and did not "materially affect the scope or meaning of the patent." Masonite is again mistaken. As noted earlier, "The courts are the final arbiter of patent validity and, although courts may take cognizance of, and benefit from, the proceedings before the patent examiner, the question is ultimately for the courts to decide, without deference to the rulings of the patent examiner." *Quad Envtl. Techs. Corp.*, 946 F.2d at 876. As explained above, this court finds that the inconsistencies in the drawings would preclude one skilled in the art from ascertaining the scope of the invention.[8] This court respectfully disagrees with the USPTO to the extent that it implied otherwise.

For the foregoing reasons, the '225 and '226 patents are invalid as indefinite and nonenabled. Accordingly, Craftmaster's motion for partial summary judgment is granted.

---

[8] Masonite's reliance on *Brandt, Inc. v. Crane*, 558 F. Supp. 1339 (N.D. Ill. 1983) – a case decided before *Southwest Software*, 226 F.3d at 1294, made clear that a certificate of correction is effective only for causes of action arising after it is issued – is misplaced. In *Brandt*, the district court decided, "[b]oth in deference to the ruling of the [USPTO granting a certificate of correction] and upon [its] own examination of the entire patent materials," that the patent was not invalid. *Id.* at 1342. In doing so, the court explained that "The two typographical errors corrected by the certificate were hardly so substantial as to convert 'gobbledygook' into an intelligible claim." *Id.* The case at bar is distinguishable since here, the errors would leave one skilled in the art guessing at to how many contour lines belonged in the upper panel of the door facing in the '225 patent and about whether the section between the two rectangular panels in the '226 patent was supposed to be flat or not.

**B.    Whether Masonite is Entitled to Partial Summary Judgment as to Craftmaster's Seventh Affirmative Defense.**

For its seventh affirmative defense, Craftmaster contends that Masonite's infringement claims are barred by license, implied license, or patent exhaustion because, according to Craftmaster, the License Agreement allows it to incorporate and make use of the Hakuju door profile in the Cashal™ door so, to the extent its Cashal™ door infringes the '225, '226, and '931 patents, an implied license exists.    Craftmaster admits that it "slightly modified the Hakuju profile when it used it in the Cashal™ door" since it "eliminated a small step near the top of the profile (near the interior panel) and made the profile slightly deeper."   (Masonite's R. 56 Statement, Ex. 2 at 27 n.2.)   For its opening brief in support of its motion for partial summary judgment on Craftmaster's seventh affirmative defense, Masonite throws in the proverbial kitchen sink.   Several of these arguments are beside the point.[9]   Masonite's remaining arguments boil down to the following:   (1) in order to be a licensed product, Craftmaster's Cashal™ door

---

[9]      For example, Masonite argues that the '931, '225, and '226 patents are not licensed under the License Agreement.   Craftmaster agrees.   Craftmaster does not argue that its seventh affirmative defense in based on an argument that the License Agreement covered the '931, '225, and '226 patents.

In addition, Masonite argues that Craftmaster's argument that its Cashal™ door is a licensed product is disingenuous given that the License Agreement obligates Craftmaster to mark its licensed products with the appropriate patent number in accordance with 35 U.S.C. § 287 and Craftmaster has not done so.   This argument is beside the point.   Masonite is not suing Craftmaster for breach of contract.

Furthermore, Masonite argues that, since Craftmaster has challenged some of the licensed patents in court in violation of Article 4.2 of the License Agreement, this challenge negates Craftmaster's argument that it is licensed under the '931, '225, and '226 patents.   First of all, Craftmaster does not appear to be arguing that it is licensed directly under the '931, '225, and '226 patents.   Secondly, this court does not see how one thing logically follows the other.   For its part, Craftmaster notes that nothing in the License Agreement precludes it from making an invalidity challenge to patents not covered by that agreement.   In any event, the court notes once again that Masonite is not suing Craftmaster for breach of contract.   Thus, this, too, is beside the point.

Masonite further argues that, in Article 1.2, the License Agreement unambiguously declines to grant a license for improvements or future developments controlled or made for or by Masonite.   (License Agreement at Article 1.2 (stating, in pertinent part: "The term LICENSED INTELLECTUAL PROPERTY RIGHTS shall not include any improvements or future developments controlled by, made by or for MASONITE . . . .")   Masonite contends that, as a result, Craftmaster's modification of the Hakuju door profile is not licensed.   Masonite's argument is not logically coherent.   While the court agrees that its premise – that Masonite-controlled improvements and future developments are not licensed under the License Agreement – is true, it does not logically follow that all improvements or future developments – even those created and controlled by others – are necessarily outside the scope of the license.   Indeed, while this language from the License Agreement informs the reader about Masonite-controlled improvements and future developments, it is silent as to other improvements and future developments.   In its reply, Masonite concedes that this is true.

must meet the requirements of both Article 1.3(i) and Article 1.3(ii) and it does neither, (2) "an alleged license of a single attribute – here the 'door panel profile' of the Hakuju door facing – does not convey an unfettered license to [Craftmaster] to modify its patents to practice improvements and future developments covered by patents . . . not subject to the License Agreement," (3) the License Agreement expressly forecloses the possibility of an implied license, and (4) Craftmaster's patent exhaustion defense is factually unsupported.

Article 7.3 of the License Agreement provides that New York law governs its interpretation. Under New York law, "the fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent;" "the best evidence of what parties to a written agreement intend is what they say in their writing." *Innophos, Inc. v. Rhodia, S.A.*, 882 N.E.2d 389, 392 (N.Y. 2008) (quoting *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002)) (internal brackets omitted). "Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide." *Id.* "Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield*, 780 N.E.2d at 170 (citations omitted). "A contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion'" *Id.* at 170-71 (citations omitted).

Masonite argues that, in order to be a licensed product, Craftmaster's Cashal™ door must meet the requirements of both Article 1.3(i) and Article 1.3(ii). However, the plain language of the License Agreement makes clear that a process or product need only fit the description of one of these two provisions in order to be a licensed product. Article 1.3 provides:

> 1.3   "LICENSED PRODUCT" shall mean any process or product, the manufacture, use, practice, importation, offer for sale or sale of which would, (i) if not licensed, infringe a VALID CLAIM of an issued patent in LICENSED INTELLECTUAL PROPERTY *and/or* (ii) incorporate or make use of any part of the LICENSED INTELLECTUAL PROPERTY.

(License Agreement at Article 1.3 (emphasis added).)  Given the use of the word "or," a process or product need only meet the requirements of either Article 1.3(i) *or* Article 1.3(ii) to be a licensed product.  Craftmaster does not argue that Article 1.3(i) causes its Cashal™ door to be a licensed product.  Rather, Craftmaster's argument is that Article 1.3(ii) causes its Cashal™ door to be a licensed product.  Craftmaster argues that it "did what it was permitted to do – it made a product that incorporated and made use of the licensed Hakuju door panel profile . . . ." (Craftmaster's Opp'n to Masonite's Mot. for Partial Summ. J. at 7.)

Masonite disputes that Craftmaster made use of or incorporated any part of the Hakuju door profile in its Cashal™ door, thereby causing the Cashal™ door to be a licensed product per Article 1.3(ii).  All Craftmaster did, Masonite argues, is use its own slight modification of the Hakuju door profile in the Cashal™ door.  According to Masonite, the License Agreement does not grant Craftmaster a license for modifications to the licensed intellectual property.   As Masonite puts its, Article 1.3(ii) "does not grant a license to any product or process that shares a single attribute – *e.g.*, a door panel profile – with the [licensed intellectual property]." (Masonite's Mem. in Supp. of its Mot. for Partial Summ. J. at 13.)  Masonite argues that such an interpretation would be so unreasonable and overbroad as to "render the License Agreement meaningless."  (*Id.*)  Regardless of what regrets Masonite may have in hindsight, as well as its suggestion as to its intention in entering into the agreement, the License Agreement unambiguously gives Craftmaster a license to any product or process that "incorporate[s] or make[s] use of *any part* of the [licensed intellectual property]."   (License Agreement at 2

(emphasis added).)  Since Masonite does not contest Craftmaster's admission that it slightly modified the Hakuju door profile, this fact is undisputed.  Since one cannot modify something without making use of it, it is clear that Craftmaster made use of some part of the Hakuju door profile.  Given this, Craftmaster's argument that its Cashal™ door is licensed under Article 1.3(ii) of the License Agreement finds support in the language of Article 1.3, which is unambiguous.  Nonetheless, as discussed below, there remains a genuine issue of material fact as to whether Article 1.3(ii) was effectively nullified by Article 2.5 to the extent that Article 1.3 grants a license to products or processes that infringe non-licensed Masonite patents.

Further complicating matters is the language in Article 1.2 that excludes improvements or future developments "as to which Masonite may grant a license" from the definition of licensed intellectual property.  Masonite appears to suggest that Craftmaster's slight modification of the Hakuju door is an improvement covered by the '931, '225, and '226 patents, such that Masonite can grant a license for the improvement's use, regardless of the fact that the License Agreement provides in Article 2.6 that Craftmaster shall own all of its improvements.  Were it true that Masonite can grant a license for Craftmaster's slight modification of the Hakuju door profile, then Craftmaster's slight modification of the Hakuju door profile, and by extension the Cashal™ door, would not be licensed under Article 1.3(ii) of the License Agreement.  Craftmaster argues that any suggestion by Masonite that its slight modification of the Hakuju door profile is covered by the '225, and '226 patents is disingenuous given that Masonite denies that the Hakuju door profile's patent (the '128 patent) was relevant to the prosecution of the '225 and '226 patents or material to the patentability of the claims of the '225 and '226 patents.  The court cannot determine who has the better of this argument without weighing the evidence.  That job is for the factfinder.

Finally, Masonite argues that Craftmaster's affirmative defense that it has an implied license is factually unsupported. Craftmaster argues that, even if its Cashal door infringes the '931, '225, and '226 patent (of course, the court has just held that latter two patents invalid, so the only remaining issue is as to the '931 patent), which it disputes, it has an implied license given that the License Agreement, reading Article 1.3(ii) as Craftmaster does, expressly provides that the Cashal door is a licensed product. (Craftmaster's Opp'n to Masonite's Mot. for Partial Summ. J. at 11.) "Where the owner of a patent grants to a licensee the right to use a patented machine, the grant carries with it, by necessary implication, a license under any other patent of the licensor which would be infringed by operation under the grant." *Amp, Inc. v. United* States, 389 F.2d 448, 453 (Ct. Cl. 1968) (citation omitted). As Craftmaster argues, to the extent that the Cashal door infringes Masonite's patents, "Masonite has impliedly given its consent to make, use, or sell the designs covered by the patents and, therefore, may not take back what it has already given." (Craftmaster's Opp'n to Masonite's Mot. for Partial Summ. J. at 12 (citing *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571 (Fed. Cir. 1997), and *Amps, Inc.*, 389 F.2d at 452 ("[T]he estoppel of the implied license doctrine involves the fact that the licensor (or assignor) has licensed (or assigned) a definable property right for valuable consideration, and then has attempted to derogate or detract from that right. The grantor is estopped from taking back in any extent that for which he has already received consideration.")).) Masonite responds that the License Agreement expressly disavows any implied license in Article 2.5. Masonite further argues that, even if the contract did not expressly foreclose the possibility of an implied license, Craftmaster has not met its burden of directing the court's attention to evidence that could lead a jury to conclude that (a) the Hakuju door profile has no non-infringing uses, and (b) the parties intended that Craftmaster be granted an implied

license.  However, neither party disputes that the Hakuju door profile is licensed under the License Agreement.  The issue is whether the Cashal™ door as a "licensed product," has no non-infringing uses and whether the parties intended to imply a license to it.  The court finds that the contract is ambiguous insofar as its language in Article 1.3(ii) grants Craftmaster a license to products that use any part of licensed intellectual property, but then, given Article 2.5, fails to allow for the grant of an implied license to the extent those licensed products infringe non-licensed Masonite patents.  The jury will need to reconcile these two inconsistent provisions.

Because there are outstanding genuine issues of material fact as to Craftmaster's affirmative defenses based on license and implied license, Masonite's motion for partial summary judgment dismissing Craftmaster's seventh affirmative defense is denied to that extent. In contrast, because Craftmaster did not address Masonite's argument that its defense of patent exhaustion was factually unsupported, Masonite's motion is granted insofar as Craftmaster's defense of patent exhaustion is stricken from Craftmaster's seventh affirmative defense.

## IV.  CONCLUSION

Given the foregoing, Craftmaster's motion for partial summary judgment is granted and Masonite's motion for partial summary judgment is granted in part and denied in part. Craftmaster's defense of patent exhaustion is stricken from its seventh affirmative defense.


ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: March 29, 2011